**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CHARLES W. HOLLOWAY,    &ast;

  *Plaintiff*,      &ast;

  v.        &ast;  Civil Action No. RDB-20-377

STATE OF MARYLAND, *et al.*,  &ast;

  *Defendants*.    &ast;

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

## MEMORANDUM OPINION

On February 2, 2020, Plaintiff Charles W. Holloway ("Plaintiff" or "Holloway") initiated the instant lawsuit against his former employer, the Maryland Military Department (the "Department") and related entities Freestate Challenge Academy ("Freestate" or "FCA") and the State of Maryland (collectively, "Defendants"), alleging that Defendants discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17. (ECF No. 1.)[1] After this Court dismissed Holloway's Complaint for failure to state a claim, (ECF Nos. 7, 8), the United States Court of Appeals for the Fourth Circuit affirmed this Court's dismissal of Holloway's hostile work environment claim, but reversed this Court's dismissal of Holloway's unlawful termination and retaliation claims and remanded the case for further proceedings. (ECF No. 13); *Holloway v. Maryland*, 32 F.4th 293 (4th Cir. 2022).

---

[1] For clarity, this Memorandum Opinion cites to the ECF generated page number, rather than the page number at the bottom of the parties' various submissions, unless otherwise indicated. Likewise, this Memorandum Opinion cites to the ECF generated document number, rather than the exhibit number provided by the parties' various submissions.

Presently pending in this case is Defendants' Motion for Summary Judgment (ECF No. 37). Holloway responded in opposition, (ECF Nos. 42, 43 ***SEALED***), and Defendants replied (ECF Nos. 49, 50 ***SEALED***). The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, Defendants' Motion for Summary Judgment (ECF No. 37) is DENIED.

## BACKGROUND

### I.   Factual Background

In ruling on a motion for summary judgment, this Court considers the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### A.  The Department Initially Hired Holloway as Freestate's Program Coordinator in 2014, Before Promoting Plaintiff to Freestate's Program Director in 2016.

Plaintiff Charles W. Holloway is a black man. (ECF No. 1 ¶ 19.) In June 2014, Holloway was hired by the Maryland Military Department to work as the Program Coordinator of Freestate Challenge Academy. (ECF No. 37-4.) According to Holloway, in that role, he "maintained direct oversight of the day-to-day operations of Freestate—a residential educational program for at-risk adolescents 16 to 18 years [old]." (ECF No. 42-1 at 3.)

In June 2016, Holloway's immediate supervisor, Charles Rose ("Rose"), a white man, was dismissed as Freestate's Program Director. (ECF No. 1 ¶ 14.) Holloway subsequently served as Acting Program Director from July 2016 to October 2016, (*id.* ¶ 15), before he was promoted to Program Director in November 2016. (*Id.* ¶ 16, ECF No. 37-8.) In this role, Holloway's immediate supervisor was General Annette Deener ("General Deener"). (ECF No. 37-8.)

2

The Program Director position description, which Holloway endorsed on November 2, 2016, provided that over 50% of the Program Director's time was to be spent "[d]irect[ing] and [m]anag[ing]," which included "[c]onduct[ing] [a] semi-annual inspection of program using the ChalleNGe Operational Resource Effectiveness (CORE) checklist to ensure FCA is able to pass National Guard Bureau [("NGB")] CORE evaluation with at least 'satisfactory' rating in all categories." (*Id.*)  The position description further provided that the Program Director was to spend 40% of his time "[p]lan[ning], [p]rogram[ming,] and [b]udget[ing]," which included: "[p]repar[ing] Annual State Plan with performance objectives as required by NGB and submitted by required suspense date;" "[p]lan[ning], [p]rogram[ming,] and [b]udget[ing] for expansion of educational opportunities for cadets;" "[p]repar[ing] annual state and federal budget on time and according to state and federal guidelines;" and "[e]nsur[ing] Internal Review (federal) and Department of Legislative Auditors (state) audits are reviewed and findings corrected and plan is put in place to prevent repeat findings in subsequent audits." (*Id.*)  The position description further provided the following were necessary for satisfactory performance: "maintain[ing] at least satisfactory rating on CORE evaluation; prevent[ing] findings on [NGB] audits;"[2] "ensur[ing] sound fiscal administration of budget;" and "prepar[ing] required plans in accordance with state, federal, and [the Adjutant General's] directed requirements." (*Id.*)

---

[2]  In his Response to Defendant's Statement of Facts and Statement of Facts Precluding Summary Judgment (ECF No. 42-1), Holloway "disputes that he was required to maintain 'a satisfactory rating on CORE evaluation[s]' . . . in order to achieve a satisfactory performance evaluation." (*Id.* at 1.)  Specifically, Plaintiff argues that "it was [not] a requirement that he maintain a satisfactory rating on each element of the CORE evaluation in order to achieve a satisfactory performance evaluation." (*Id.*)  This Court finds it prudent to note that the position description explicitly provides as much. (ECF No. 37-8 (noting the Program Director must "ensure FCA is able to pass [NGB] CORE evaluation with at least 'satisfactory' rating in all categories").)

**B.  In 2016 and 2017, Holloway Received Positive Performance Evaluations.**

In December 2016, General Deener presented Holloway with his fiscal year ("FY") 2016 performance evaluation, which rated Holloway's performance 2.83/3.00.  (ECF No. 37-10.)  The performance evaluation identified tasks to be achieved before the next mid-cycle rating, which included "[p]lan, budget and execute resources as efficiently as possible."  (*Id.*)

In June 2017, General Deener presented Holloway with his FY 2017 mid-cycle evaluation.  (ECF No. 37-12.)  The evaluation indicated that Holloway "exhibited [o]utstanding job performance, meeting the required and expected results for [his] position."  (*Id.*)

In December 2017, General Deener presented Holloway with his FY 2017 performance evaluation, which rated his performance 2.93/3.00.  (ECF No. 37-13.)  The performance evaluation again identified tasks to be achieved before the next mid-cycle rating, which included "[p]lan, budget and execute resources as efficiently as possible" and "[l]everage state and federal funds and FCA Foundation to best meet program requirements."  (*Id.*)

**C.  In February 2018, Holloway Complained Internally.**

In February 2018, Holloway met with Kirsten Williamson ("Williamson"), the Director of Program Equity and Equal Opportunity Commission ("EEO") and the Americans with Disabilities Act ("ADA") Compliance Officer for the Maryland Military Department.  (ECF No. 42-1 at 5.)  Holloway contends that he "reasonably believed" that the Department's Director of Human Resources Nicholas Pindale ("Pindale") "was discriminating against him," as Pindale instructed Holloway to work directly with Pindale's subordinate, Princess

Neal-Washington ("Neal-Washington"), a black woman, "a directive [Pindale] did not provide to [Rose,] Holloway's white predecessor," and Pindale did not respond to Holloway's attendance policy and did not address Holloway's pay inequity compared to Rose. (*Id.* at 5 (citing ECF No. 42-5).) Holloway further asserts that he went to Williamson intending to file a written complaint of discrimination based on race, but Williamson allegedly "pressured him" and instructed him to engage in mediation in lieu of filing a written complaint. (*Id.* (citing ECF No. 42-6).) According to Holloway, the February 2018 mediation led to an agreement between himself and Pindale. (*Id.* (citing ECF Nos. 42-4, 42-6).)

Holloway contends that shortly after this initial complaint, Pindale asked one of Holloway's subordinates, a white woman, whether she felt safe at FCA under Holloway's leadership. (*Id.* at 7 (citing ECF No. 42-7).) Pindale asked this question in the presence of Neal-Washington, who testified that, in her opinion, Pindale asked the question "to plant seeds of incompetency in [] Holloway's position and in his role as a director." (ECF No. 42-7.)

### D. In March 2018, Holloway Allegedly Met with Williamson for a Second Time, Though Defendants Dispute This.

According to Plaintiff, "[a]s a result of the continued discriminatory treatment that [] Holloway endured, [he] initiated a second internal complaint with [] Williamson" in March 2018. (ECF No. 42-1 at 6.) While Defendants dispute that this second informal complaint occurred, (ECF No. 50 *SEALED* at 12–13), Holloway contends that Pindale "breach[ed] [] the February 2018 agreement," "refuse[d] to address [] Holloway's pay disparity," and "continued unequal treatment" of Holloway compared to Rose. (ECF No. 42-1 at 6.) Holloway asserts that he went to Williamson intending to file a written complaint of discrimination based on race, but, as with the February 2018 complaint,

Williamson allegedly "pressured him" and instructed him to engage in mediation in lieu of filing a written complaint, and another mediation took place.  (*Id.* (citing ECF No. 42-5).)

Holloway contends that shortly after his second complaint to Williamson, Jeffrey Teller ("Teller"), then-Director of Administration for the Department, contacted General Deener regarding police presence at FCA.  (*Id.* at 7.)  In his deposition, Holloway testified that he had already spoken to General Deener about the police presence at Freestate.  (ECF No. 42-8.)  In short, Holloway complains that, rather than engaging with Holloway, Teller went to General Deener to raise concerns about Holloway's performance.  (*Id.*)

### E. In May 2018, the NGB Performed a Scheduled Inspection of Freestate, and Freestate Did Not Perform Well.

From May 8, 2018 to May 10, 2018, the National Guard Bureau, through a contractor, Alutiiq, performed an inspection of FCA (the "May 2018 inspection").  (ECF No. 37-14.)  General Deener testified that if FCA received a negative rating in such an evaluation, Freestate ran the risk of losing federal funding from the NGB, which "puts the program in jeopardy." (ECF No. 37-16.)

In a May 10, 2018 letter (the "Alutiiq letter") from Alutiiq Resource Inspector Izzy McPhail ("McPhail") addressed to the Chief of the NGB Youth Programs, McPhail indicated that Holloway was advised of the inspection scheduled for May 8–10, 2018 via email on October 2, 2016, and again on February 5, 2018.  (ECF No. 37-14.)  "The Inspection Team attempted telephonically and via email to obtain necessary documentation in advance of the onsite inspection to no avail."  (*Id.*)  The Alutiiq letter further explained that during the May 2018 inspection, FCA received an inspection consisting of four components: "Operations Compliance, Resource Management Compliance, Operations Performance[,] and

Financial Performance." (*Id.*)  "[FCA] personnel provided the Inspection Team incomplete data for [FYs] 2012, 2013, and 2014 . . . prior to and during the onsite inspection; [and] as a result, the Inspection Team could not validate the data and FCA received an overall Unsatisfactory rating for the Financial Performance component." (*Id.*)

The letter also provided detail on NGB's "Significant Finding," which provided: "The Cooperative Agreement [("CA")] modifications provided for [FYs 2012–2014] do not balance with the funding authorization documents.  Likewise, the final Standard Form 270s . . . provided did not balance with the close out CA modifications.  Finally, state and federal personnel did not provide supporting documentation for the dining facility charges." (*Id.*)  The letter went on to provide examples of inconsistencies from FYs 2012–2014.  (*Id.*)  It emphasized that "Multifaceted deficits at all levels were the root cause of the rating of Unsatisfactory in the Federal Dollar Cost per Cadet and Budget Execution standards.  Specifically, the . . . inability to provide documentation.  Ineffective reconciliations and inaccurate closeout/documentation of [FYs 2012–2014] are the greatest contributors to the overall Unsatisfactory performance rating." (*Id.*)

In his Response to Defendant's Statement of Facts and Statement of Facts Precluding Summary Judgment, Holloway emphasizes that the inspection assessed the financial performance of FCA for FYs 2012, 2013, and 2014, "years which predated [his] tenure as [FCA's Program] Director." (ECF No. 42-1 at 9 (citing ECF No. 43).)  He further emphasizes that "[t]he budgetary issues resulted from NGB receiving incomplete data from [f]ederal and [s]tate personnel, individuals [that] Holloway did not have control over." (*Id.* (citing ECF Nos. 43, 42-12).)

In addition to the letter, Alutiiq issued a report of inspection (the "Alutiiq report") providing a detailed explanation of areas of noncompliance identified during the May 2018 inspection.  (ECF No. 37-15.)  Notably, the Alutiiq report noted that Holloway "failed to implement adequate financial management and internal control measures."  (*Id.*)  "[Holloway] was not familiar with the management and internal controls required at his level; as a result, the [Program] Director does not have any management and internal controls in place. . . . In general, FCA lacks proper management and oversight."  (*Id.*)  The Alutiiq report recommended that Holloway "ensure that he has a comprehensive understanding of the [f]ederal and [s]tate regulations, policy and doctrine, which govern the Youth Challenge Program" and "coordinate with [] Department and the United States Property and Fiscal Officer to review all Standing Operating Procedures (SOP) for approval with a final review by the Judge Advocate."  (*Id.*)

The Alutiiq report further found that FCA did not meet all the requirements of the biennial Director's Self-Assessment ("DSA"), and Holloway "accurately assessed that FCA was not submitting quarterly budget reports to the Program Office within the required timeframe."  (*Id.*)  The Alutiiq report indicated that Holloway "failed to provide a response in the DSA for this area of non-compliance."  (*Id.*)

As a result of the findings of the May 2018 inspection, the NGB required Holloway to develop and submit a Corrective Action Plan ("CAP") that addressed each of the unsatisfactory findings.  (ECF Nos. 37-17, 37-6, 37-18.)  The CAP was to be submitted to NGB by July 9, 2018.  (ECF No. 37-18.)  According to Defendants, Holloway was instructed to circulate a draft to Teller for review with Adjutant General Singh prior to submitting the

CAP to the NGB.  (ECF No. 37-3 at 14 (citing ECF No. 37-29).)

### F. Holloway Subsequently Received an "Unsatisfactory" Rating for his FY 2018 Performance Evaluation.

On May 18, 2018—prior to her June 5, 2018 retirement[3]—General Deener presented Holloway with his FY 2018 performance evaluation, which indicated that Holloway was rated 1.66/3.00.  (ECF Nos. 37-19, 37-16.)  Holloway was rated "1" for "[u]nsatisfactory" for several job duties.  (ECF No. 37-19.)

Like previous evaluations, the performance evaluation identified tasks to be achieved before the next mid-cycle rating, which included "[p]lan, budget and execute resources efficiently and effectively [and] [e]nsure state and federal [program managers] are meeting [cooperative agreement], state[,] and federal requirements."  (*Id.*)  Under "Supervisor's Comments," the performance evaluation provided the following: "The program fell short of meeting program goals and objectives since previous CORE inspection.  Mr. Holloway has the potential to develop an effective [CAP] to improve performance indicators and meet program goals and objectives."  (*Id.*)

In her deposition, General Deener testified that she met with Adjutant General Linda Singh ("Adjutant General Singh") prior to issuing the evaluation, as Adjutant General Singh is ultimately responsible for all Department personnel.  (ECF No. 37-16.)  She further testified that Holloway's unsatisfactory FY 2018 was primarily driven by the poor results of the May 2018 inspection, and that both she and Adjutant General Singh were alarmed by

---

[3] Upon General Deener's retirement, Teller became Acting Chief of Staff of the Department and Holloway's direct supervisor.  (ECF No. 42-4.)  In his Response to Defendant's Statement of Facts and Statement of Facts Precluding Summary Judgment, Holloway claims Teller spent considerable time training with General Deener prior to her retirement, which "allowed [him] to influence General Deener's perception of [Holloway's] performance."  (ECF No. 42-1 at 13.)

Holloway's lack of communication with the inspection team prior to the scheduled inspection date, despite repeated requests from the NGB staff and Alutiiq.  (*Id.*)

Adjutant General Singh testified that she also felt it was necessary to meet with General Deener regarding Holloway's FY 2018 performance evaluation prior to the evaluation being issued to Holloway.  (ECF No. 37-20.)  Specifically, Adjutant General Singh noted "[s]ignificant absences;" "students . . . were getting into trouble;" "[p]olice were showing up;" and "problems with cadre . . . not showing up . . . [and] not being where they were supposed to be."  (*Id.*)  She further testified that "[a]ll that is under the direct control of Mr. Holloway."  (*Id.*)

### G. Eleven Days Later, Holloway Submitted a "Discrimination Complaint Form" Against the Maryland Military Department Human Resources.

On May 29, 2018, Holloway submitted a "Discrimination Complaint Form" against the "Maryland Military Department Human Resources," citing "[r]etaliation" as the basis of the alleged discrimination.  (ECF No. 37-21.)  Therein, Holloway stated the following:

> In [February 2018] I met with [] Pindale about his blatant disregard for my position and his refusal to contact me in regard[] to problems or concerns that he had within my organization.  [] Pindale stated he would make a concretive effort to contact me to avoid issues manifesting.  In mid to late 2017 I met with the EEO office, Deputy Director of Human Resources and Director [] Pindale to address the same issue, it was agreed then that we would attempt to openly communicate about concerns to alleviate any concerns.  [] Pindale continues to circumvent my authority.  Most recently [] Pindale became aware that I spoke to the EEO office through his supervisor and he subsequently retaliated by manipulation within his department.   [] Pindale continues to depict my department in a negative light with the intention of my termination.

(*Id.*; *see also* ECF No. 37-3 at 12 n.4 (citing ECF No. 37-11).)

Sometime after Holloway filed his Discrimination Complaint Form,[4] Teller requested Holloway report to his office at 6:30 AM.  (ECF No. 42-1 at 14 (citing ECF No. 37-29).)  According to Holloway, Teller berated Holloway during that meeting.  (*Id.*)

On June 5, 2018, a Climate Survey was circulated to FCA employees "to elicit feedback . . . about their work environment."  (ECF No. 41-10.)  The memorandum attached thereto indicated that the survey "addresse[d] subjects regarding leadership, diversity, and the employee's overall work environment."  (*Id.*)  Neal-Washington testified that this Climate Survey was the only such survey she had seen conducted during her "[a]lmost 17 years" with the State of Maryland's Human Resources.  (ECF No. 42-7.)  When asked "who decided to administer the [] survey," Neal-Washington testified: "I know that there was a discussion held by Nick Pindale and Jeffrey Teller.  I don't know beyond the who determined to do it or where else it was discussed."  (*Id.*)  When asked if she had any opinion as to why the survey was administered, Neal-Washington opined "[t]o plant a seed of [Holloway] being incompetent in his role."  (*Id.*)

On June 7, 2018, Holloway submitted a "Mediation Referral/Request Form" to the State of Maryland Shared Neutrals Mediation Program related to his May 29, 2018 complaint.  (ECF No. 37-22.)  Therein, Holloway indicated that he was in conflict with Pindale and described the conflict as "[r]etaliatory actions: usurped authority; public exclusion resulting in humiliation and lack of professional guidance when requested."  (*Id.*)

On June 15, 2018, Pindale submitted a "Mediation Referral/Request Form" to the State of Maryland Shared Neutrals Mediation Program related to Holloway's May 29, 2018

---

[4] Holloway's Complaint suggests this meeting occurred sometime in June 2018.  (ECF No. 1 ¶ 54.)

complaint.  (ECF No. 37-23.)  Pindale described the conflict as follows: "A complain[t] has been made against me by [Holloway].  I have agreed to participate in [m]ediation in order to better understand why [] Holloway has filed his [complaint] and in the hope that . . . doing so . . . will bring resolution to his concern and improve our working relationship."  (ECF No. 37-23.)  He further indicated that he was aware that a grievance had been filed, but did not know when the grievance was filed and was "[not] really sure" "[w]hat was being grieved." (*Id.*)

In a June 27, 2018 email to Williamson, Holloway indicated that "[he] would like to move forward with the [complaint] and discontinue the mediation process."  (ECF No. 37-24.) He further indicated that he "would . . . like to take [his complaint] outside of the agency." (*Id.*)

### H. Holloway Submitted the CAP on July 3, 2018, But Neglected to Circulate the CAP to Teller Prior to Doing So.  After the NGB Noted "Several Areas [] Need a Bit More Attention," Holloway Submitted a Revised CAP, Which Was Similarly Deficient.

On July 3, 2018, Holloway submitted the CAP to the NGB via email.  (ECF No. 37-28.)  Teller responded to Holloway's email to NGB indicating: "[N]either myself nor [Adjutant General] Singh had a chance to review this CAP . . . prior to its submission to your [team].  I'd like to have the feedback sent to me regarding its present state in addressing all of the deficiencies."  (ECF No. 37-30.)

On July 17, 2018, the NGB sent an email outlining "several areas that need a bit more attention" and requesting that suggested revisions be made by August 3, 2018.  (ECF No. 37-31.)  Holloway submitted a revised submission of the CAP to the NGB on August 3, 2018.  (ECF No. 37-32.)  The revised CAP, which was not provided to Teller for

review with Adjutant General Singh prior to the submission, also required additional revisions. (ECF No. 37-29.)

**I.  In Late July 2018, Defendants Discussed Holloway's Impending Termination.**

On July 27, 2018, Teller sent an email to Adjutant General Singh with the subject "C. Holloway (UNCLASSIFIED)."   (ECF No. 42-17.)   The email discussed Holloway's May 29, 2018 internal complaint and the "impending termination of him."  (*Id.*)  In short, the email noted that Teller had consulted with the Office of the Attorney General of Maryland, who "expressed concern about the timing," and as such, Teller "recommend[ed] that [FCA] defer his termination until the complaint is settled."  (*Id.*)   According to Holloway, FCA delayed terminating him "to argue that the termination 'was separate and distinct' from [Holloway's] formal complaint."  (ECF No. 41-1 at 14.)

**J.  An Investigation into Holloway's May 29, 2018 Complaint Concluded There Was "No Evidence to Substantiate [His] Claim of Different Treatment Based on Retaliation Pursuant to Title VII" and State Law.**

In an August 14, 2018 letter to Holloway, Williamson explained that his May 29, 2018 complaint was forwarded to the Department of Budget and Management to be investigated through the Employee Complaint Assistant Program ("ECAP").  (ECF No. 37-25.)  The letter further provided that the complaint was investigated in accordance with Md. Code, State Pers. & Pens. § 5-208, and it was concluded that there was "no evidence to substantiate [his] claim of different treatment based on retaliation pursuant to Title VII" and state law.  (*Id.*)

ECAP issued a "Summary of Investigation" to the Department.   (ECF No. 37-27.) The summary provided: "It is indisputable that the investigation found evidence of [Holloway]'s attempts to work out his difficulties with Pindale but did not engage in prior

protected activity as defined under Title VII.  Consequently, [Holloway]'s allegation of different treatment based on retaliation could not be sustained under Title VII . . . [or state law]."  (*Id.*)

### K. On August 22, 2018, Holloway Resigned in Lieu of Termination.

On August 22, 2018, Adjutant General Singh notified Holloway of his termination. (ECF No. 37-5.)  She permitted Holloway to resign in lieu of termination, and Holloway did so.  (*Id.*, ECF No. 37-7.)  In his Response to Defendant's Statement of Facts and Statement of Facts Precluding Summary Judgment, Holloway claims that "Defendants told [him] that he was being terminated because of low enrollment numbers and budgetary issues identified in the May 2018 [inspection]," as well as attendance issues, the number of Serious Incident Reports (SIRs) at FCA, his CAP response, and his May 2018 performance evaluation.  (ECF No. 42-1 at 11, 14–17.)  Holloway contends that the Defendants' reasons evolved after he initiated the instant lawsuit.  (*Id.* at 14.)

Holloway was replaced by a white woman.  (*Id.* at 19 (citing ECF No. 42-9).)  Holloway emphasizes that this successor was selected even though "an African American male[] was [] Holloway's direct subordinate, and [his successor's] superior."  (*Id.*)  Holloway complains that his successor, like his white predecessor, had a higher salary.  (*Id.*)

On August 24, 2018, Holloway filed a charge of discrimination with the Maryland Commission on Civil Rights and the United States Equal Employment Opportunity Commission ("EEOC").  (ECF No. 37-9.)

On October 19, 2018, the CAP was resubmitted.  (ECF Nos. 37-29, 37-33.)  This third resubmission was ultimately approved, (ECF No. 37-29), though Holloway contends that the

budgetary issues identified in the May 2018 inspection were not resolved until June 26, 2019. (ECF No. 42-1 at 19 (citing ECF No. 43-3).)

## II.    Procedural Background

On February 2, 2020, Holloway initiated the instant lawsuit against his former employer, the Maryland Military Department, and related entities Freestate Challenge Academy and the State of Maryland, alleging wrongful termination, hostile work environment, and retaliation. (ECF No. 1.) Although he asserted claims under Title VII and Maryland law, he subsequently abandoned his Maryland law claims. (ECF No. 5-1 at 23.)

On April 15, 2020, Defendants moved to dismiss Holloway's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 4.) This Court granted Defendants' motion and dismissed Holloway's Complaint. (ECF Nos. 7, 8.) Holloway appealed, and the Fourth Circuit affirmed this Court's dismissal of Holloway's hostile work environment claim, but reversed this Court's dismissal of Holloway's wrongful termination and retaliation claims and remanded for further proceedings. (ECF No. 13); *Holloway v. Maryland*, 32 F.4th 293 (4th Cir. 2022).

Discovery in this matter has now concluded. (ECF No. 35.) Defendants have moved for summary judgment (ECF No. 37), and the matter has been fully briefed (ECF Nos. 37, 42, 43 \***SEALED**\*, 49, 50 \***SEALED**\*).

### STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A

material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656–60 (2014).

## ANALYSIS

Holloway's Complaint presently alleges that Defendants unlawfully terminated and

retaliated against him.  (ECF No. 1.)  Through their Motion for Summary Judgment (ECF No. 37), Defendants contend that summary judgment should be granted on both claims.  With respect to the wrongful termination claim, Defendants assert that they are entitled to summary judgment because Holloway cannot make a prima facie case under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  (ECF No. 37-3 at 21–24.)  With respect to the retaliation claim, Defendants assert that they are entitled to summary judgment because Holloway never engaged in protected activity, (*id.* at 24–28), and Holloway has failed to establish causation.  (*Id.* at 28–33.)  The parties' respective arguments are discussed below in turn.

## I.  Holloway's Wrongful Termination Claim

A plaintiff advancing a wrongful termination claim can overcome summary judgment through direct evidence that discrimination motivated the decision to terminate him, or through the burden-shifting scheme established in *McDonnell Douglas*.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004).  Holloway proceeds under the three-step *McDonnell Douglas* burden-shifting framework.  Holloway must first "show that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances."  *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004).  The burden then shifts to Defendants to produce evidence of a legitimate, non-discriminatory reasons for terminating Holloway.  *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 575 (4th Cir. 2015) (citing *McDonnell Douglas*, 411 U.S. at 802).  Holloway must then present evidence creating a triable issue of fact that

Defendants' asserted reasons for his termination are pretextual.  *Id.* at 575–76.

Defendants contend that they are entitled to summary judgment because Holloway cannot make a prima facie case of wrongful termination.[5]  (ECF No. 37-3 at 21–24.)  It is undisputed that Plaintiff, who is a black man, is a member of a protected class, and it is further undisputed that Holloway's employment was terminated.  (ECF No. 37-3 at 15–16, 19.)  As such, this Court limits its discussion to the second and fourth elements of wrongful termination.

With respect to the second requirement—that Holloway show that he was qualified for his job and his job performance was satisfactory—the parties' various filings make clear that Holloway's work performance is genuinely disputed.  First, Holloway was a relatively long-term employee with a history of favorable performance evaluations and a promotion.  (ECF Nos. 37-8, 37-10, 37-12, 37-13.)  While General Deener testified that she needed to speak with Holloway in early 2018 about behavioral issues for cadets, (ECF No. 50 ***SEALED** at 5 (citing ECF No. 50-3 ***SEALED***)), and Adjutant General Singh similarly testified that she started to observe issues with Holloway's performance in late 2017, (*id.* at 5–6 (citing ECF No. 50-2 ***SEALED***)), the record is otherwise devoid of evidence suggesting that Holloway was ever spoken to about performance deficiencies or otherwise prior to his May 2018 performance evaluation.  Indeed, General Deener testified that she had "no concerns about his employment" through at least March of 2018.  (ECF No. 42-4.)  With respect to the May 2018

---

[5]  Defendants also argue that they are entitled to summary judgment because there is no direct evidence to demonstrate that Holloway's race was the motivating factor in his termination.  (ECF No. 37-3 at 19–21.) Holloway appears to concede as much, as his response relies on the burden-shifting scheme from *McDonnell Douglas*.  As such, this Court need not further address Defendants' argument that Holloway has not advanced any direct evidence.

inspection results and subsequent issues which preceded Holloway's August 22, 2018 termination, Holloway's responsibility for the errors is disputed. While the record certainly suggests that Holloway's performance declined in 2018, at bottom, whether Holloway was performing satisfactorily and whether the results of the May 2018 inspection were Holloway's fault or whether Holloway was blamed for the failings of others—and thus did not meet legitimate performance expectations—are factual disagreements for the jury to decide and cannot be grounds for summary judgment.

With respect to the fourth element—that Holloway show that other employees who are not members of the protected class were retained under apparently similar circumstances—Defendants contend that "there is no evidence that [Holloway's] predecessor, . . . a white male, received more favorable treatment." (ECF No. 50 ***SEALED***  at 1–5.) In short, the parties' filings make clear that this element is also genuinely disputed.

Holloway contends that Rose was also given an overall unsatisfactory rating in a prior NGB inspection in 2014, but this rating was not fatal to his employment, and his predecessor was employed until June 2016. (ECF No. 42-2 at 9–10 (citing ECF Nos. 43-1 ***SEALED***, 37-3).) Defendants argue that the NGB audit conducted during Rose's tenure indicated that "there were no Significant Findings identified in the assessment," and stress that NGB did not find that Holloway's predecessor repeatedly failed to provide requested information to inspectors. (ECF No. 50 ***SEALED*** at 2 (citing ECF Nos. 50-1 ***SEALED***, 42-13, 37-14).) However, whether Holloway's citation to the prior NGB inspection under Rose "holds [] comparative weight" is a question for the jury.

With respect to Plaintiff's contention that Defendants created a new job for Rose when

they terminated him as Program Director of FCA, Defendants contend that Rose explicitly asked Defendants if there were any other employment opportunities within the Department, whereas Holloway did not.   (ECF No. 50 ***SEALED*** at 4 (citing ECF No. 50-3 ***SEALED***).)   Again, whether this is illustrative of more favorable treatment towards Holloway's white predecessor is a question for the jury.

Having established a prima facie case for purposes of this motion, Holloway must also raise a triable claim that Defendants' purported legitimate non-discriminatory reasons given for his termination were pretext for intentional discrimination based on his race.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.").  Defendants assert that Holloway was terminated for a myriad of legitimate non-discriminatory reasons, including "(1) his failure to provide data requested by the NGB ahead of, and during the May 2018 [i]nspection; (2) the unsatisfactory results in [Alutiiq report], including a Significant Finding; (3) his failure to follow the NGB's instructions with respect to the CAP . . . ; (4) low enrollment numbers; and (5) the overall environment at Freestate under his leadership.  (ECF No. 50 ***SEALED*** at 8 (citing ECF Nos. 17, 37-14, 37-15, 37-19, 50-2 ***SEALED***, 50-3 ***SEALED***, 49-8, 50-4 ***SEALED***).)   Plaintiff contends that Defendants' asserted non-discriminatory reasons for terminating him are not legitimate.  (ECF No. 42-2 at 14.)  This Court finds that Holloway has met his burden at summary judgment.  Viewing the facts in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether the asserted reasons for the termination are pretexual.  As noted above, the parties dispute whether Holloway was primarily responsible for FCA's failure

to provide the data requested by NGB, and similarly whether Holloway was responsible for the unsatisfactory results in the Alutiiq report.  The parties also dispute whether Holloway failed to follow NGB instructions with respect to the CAP; whether FCA had low enrollment numbers during Holloway's tenure, though Defendants aptly note that Plaintiff appears to conflate graduation data with enrollment data; and whether the overall environment at FCA declined under Holloway's leadership.  As such, this Court finds that Plaintiff has proffered sufficient evidence of "pretext" for his Title VII claim for wrongful termination to survive summary judgment.

## II.   Holloway's Retaliation Claim

Title VII forbids an employer from retaliating against an employee because he has opposed an unlawful discriminatory employment practice.  42 U.S.C. § 2000e-3(a).  In order to prevail on a claim of retaliation, a plaintiff must either offer "sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting framework."  *See Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021 (quoting *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015)).   Holloway again proceeds under the three-step *McDonnell Douglas* burden-shifting framework.  At the first step, he must show (1) that he engaged in protected activity and, (2) because of this, (3) Defendants took an adverse employment action against him.  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).  The burden then shifts to Defendants to articulate a legitimate nonretaliatory reason for the adverse action.  *Id.*  If so, then Holloway must prove that the nonretaliatory reason articulated by Defendants was not the true reason but rather a pretext for retaliation.  *Id.*; *see also Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 176 (4th Cir. 2023).

Again, Defendants do not dispute that Holloway was terminated.  As such, this Court need only address the first and second elements of retaliation with respect to the first step. An individual engages in "protected activity" when they "oppos[e] any act or practice made unlawful by [Title VII] or initiat[e] or participat[e] in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  With respect to this element, the parties disagree centrally about whether Plaintiff's verbal complaint—or verbal complaints, according to Holloway—to Williamson constituted protected activity because he did not explicitly mention his race or discrimination, and further whether his May 29, 2018 written complaint constituted protected activity because of the same.

First considering Plaintiff's verbal complaint—or complaints, according to Plaintiff— to Williamson, this Court notes that the only evidence in the record regarding the substance of this conversation—or conversations, according to Plaintiff—is Williamson's own recollection as stated in an affidavit.  (ECF No. 37-11).  Plaintiff also provided an affidavit, but neglected to provide his own recollection therein.  (*See* ECF No. 42-12.)  Rather, Plaintiff merely cites to his Complaint (ECF No. 1), Defendants' Answer (ECF No. 17), and his own responses to the Defendants' Request for Admissions (ECF No. 42-6) and Interrogatories (ECF No.42-5).  (*See* ECF No. 42-1 at 5–6.)  Excerpts of Holloway's testimony in the record do not address the verbal complaints, (*see* ECF Nos. 37-6, 42-8, 49-1), though Plaintiff's August 24, 2018 "Charge of Discrimination" provided that: "On or about February 1st, March 1st, and May 28th, 2018, I filed internal discrimination complaints with Kirsten [sic] Williamson (African American), EEO Officer regarding the aforementioned discriminatory harassment."  (ECF No. 37-9.)

"[W]here the nonmoving party will bear the burden of proof at trial," Fed. R. Civ. P. 56(c) "requires the nonmoving party to go beyond the pleadings." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As such, this Court will not further address the issue of whether any verbal complaint—or complaints—made by Holloway in early 2018 constituted protected activity, as Plaintiff has failed to substantiate such claims.

Turning to Plaintiff's May 29, 2018 submission of a "Discrimination Complaint Form," (ECF No. 37-21), Defendants argue that the complaint failed to include reference to race, (ECF No. 50 *SEALED* at 13 (citing ECF No. 37-21)), and further note that the subsequently submitted "Mediation Referral/Request Form" also failed to reference race, discrimination based on race, or discrimination, more generally. (*Id.* (citing ECF No. 37-22).) "[T]o qualify as protected activity, an [individual's] complaints must [] communicate a belief that the [defendant] has engaged in . . . a form of [] discrimination based on a protected class. . . . Complaints about management activities that would not constitute unlawful discrimination do not count as protected activity." *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 604 (D. Md. 2018) (internal quotations and citations omitted). General complaints of unfair treatment are not protected activity. *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F.Supp.2d 577, 587 (D. Md. 2012). However, where a defendant understood or should have understood that the plaintiff opposed an unlawful practice, that opposition is protected activity. *Burgess v. Bowen*, 466 F. App'x. 272, 282 (4th Cir. 2012). To determine whether a defendant should have understood the complaint to constitute a protected activity, a court must consider whether the defendant could have understood the complaint in the context in which it was made. *Id.* (holding that the employee's verbal complaint of being "targeted" should have conveyed to

the employer a concern of racial discrimination); *Okoli v. City of Balt.*, 648 F.3d 216, 223–24 (4th Cir. 2011) (finding that although the employee did not explicitly mention sexual harassment or convey details of the incident, the use of the word "harassment" was enough to convey to the employer that her complaint "likely encompassed sexual harassment").

The form submitted on May 29, 2018 was titled "Discrimination Complaint Form." (ECF No. 37-21.)  Therein, Holloway indicated that he believed the "Maryland Military Department [of] Human Resources" discriminated against him, citing "[r]etaliation" as the basis of the alleged discrimination and "working conditions" as issues associated with his complaint.  (*Id.*)  The form provided that the alleged discrimination occurred in 2017, and provided Williamson, Neal-Washington, General Deener, and Teller as witnesses.  (*Id.*)  While Plaintiff outlined attempts taken to resolve the conflict, he did not mention race.  (*Id.*)  Nevertheless, the May 29, 2018 form, taken in context, should have communicated to Defendants that Plaintiff believed that he was being unlawfully discriminated against.  *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 249 (D. Md. 2016) (finding employer could have understood its employee's complaint was based on racial discrimination where the plaintiff was black and complained of a distinction in treatment between herself and a white teacher and labeled the distinction discrimination).  Moreover, the July 27, 2018 email from Teller to Adjutant General Singh certainly suggests as much.  (ECF No. 42-17.)  Thus, viewed in the light most favorable to Plaintiff, Plaintiff has shown that his May 29, 2018 constituted a protected activity.

Turning to the issue of causation, a plaintiff may establish causation by showing the "adverse act bears temporal proximity to the protected activity."  *Johnson v. United Parcel Serv.,*

*Inc.*, 839 Fed. App'x 781, 784 (4th Cir. 2021) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).  The temporal relationship must be "very close" to support a reasonable inference of retaliatory causation.  *Pascual v. Lowe's Home Ctrs.*, 193 F. App'x 229, 233 (4th Cir. 2006).  Although there is no bright-line for determining when a temporal relationship is "very close," the Fourth Circuit has held that as little as three months between a plaintiff's protected activity and a defendant's retaliatory act is too long to give an inference of causality.  *Id.* Additionally, two months has been deemed "sufficiently long so as to weaken significantly the inference of causation between the two events." *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003).

Here, Plaintiff attempts to demonstrate causation based on temporal proximity.  As discussed above, Plaintiff engaged in protected activity on May 29, 2018.  On August 22, 2018, he was terminated.  Thus, approximately three months passed between Plaintiff's protected activity and Defendants' termination of him.  Nevertheless, a July 27, 2018 email between Teller and Adjutant General Singh suggests that Defendants' determination to terminate Plaintiff came well before August 22, 2024.  (ECF No. 42-17.)  As such, this Curt is satisfied that Plaintiff has shown causation for purposes of this motion.

Lastly, this Court considers whether Defendants had a legitimate non-discriminatory reason for Holloway's termination.  Similar to the reasons noted above in this Court's discussion of Plaintiff's wrongful termination claim, this Court finds that Holloway has met his burden at summary judgment.  Viewing the facts in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether the Defendants' asserted reasons for termination are pretextual.

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 37) is DENIED.

A separate Order follows.

Date: March 12, 2024.                                    _____/s/_____

Richard D. Bennett
United States Senior District Judge